# EXHIBIT 24

```
 1         IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF ILLINOIS
 3
 4   CASE NUMBER: 3:12cv-52-NJR-SCW
 5
 6   IN RE DEPAKOTE CASES:
 7   D.B., a minor by IRINA BURNETT,
 8   individually and as next friend of D.B.
 9             Plaintiff,
10   vs.
11   ABBOTT LABORATORIES, INC.,
12             Defendant.
13
14
15
16               DEPOSITION
17                   OF
18         NATHANIEL H. ROBIN, M.D.
19            November 16, 2017
20
21
22
23   REPORTED BY: Heather Spier
24            Certified Court Reporter,
25            and Notary Public
```

1   history in here about Mr. or Mrs.
2   Burnett's cognitive functioning or
3   cognitive functioning of others in the
4   family; is that correct?
5         A.    Correct.
6         Q.    Is that something that you
7   would typically be interested in when
8   you're evaluating somebody who has
9   cognitive deficits?
10        A.    Yes.  On a clinical basis,
11  yes.
12        Q.    Okay.  But in this context you
13  didn't think it was important?
14        A.    Correct.
15        Q.    I also didn't see any
16  reference to any alcohol usage by Ms.
17  Burnett during the pregnancy.  Is that in
18  your report?
19        A.    Not that I recall.
20        Q.    Do you remember being aware of
21  Ms. Burnett using alcohol during
22  pregnancy?
23        A.    No.
24        Q.    Could that be important to
25  your evaluation?

```
 1           A.      Evaluation in the clinical
 2   context or evaluation for the question I
 3   was asked in this case?
 4           Q.      Let's do both.  In the
 5   clinical context would that be important?
 6           A.      Yes.
 7           Q.      Would it be important to you
 8   in this context?
 9           A.      Not as important.
10           Q.      Still relevant, though?
11           A.      Potentially.
12           Q.      What can exposure to alcohol
13   in early parts of the pregnancy result in
14   in the baby?
15           A.      So there's a spectrum of
16   anomalies associated with alcohol exposure
17   prenatally, ranging from full-blown fetal
18   alcohol syndrome to something called fetal
19   alcohol or alcohol-related disorders,
20   which is more of a cognitive profile.  Do
21   you want me to go on?
22           Q.      That's fine.
23
24                   (Whereupon, Defendant's
25                   Exhibit 9 was marked for
```

Nathaniel H. Robin, M.D.

 1                    identification.)
 2
 3         Q.    This is an exhibit that was
 4   previously marked as Exhibit 13 in the
 5   deposition of Dr. Edwards I believe.  It's
 6   an excerpt of medical records?
 7               MS. WILLIAMSON:  Could it have
 8   maybe been Clare McLain?
 9               MR. CHILDS:  Yes.  Yeah, I
10   thought it was Edwards.  But it is
11   whatever it is.
12         Q.    So have you seen these records
13   before, Dr. Robin?
14         A.    I may have.  I don't recall.
15         Q.    Okay.  So on the front page,
16   the first page of it, there is a list of
17   problems.  Second one says "smoker."  Do
18   you see that?
19         A.    Yes.
20         Q.    And did you know that Ms.
21   Burnett was a smoker throughout pregnancy?
22               MS. WILLIAMSON:  Objection.
23         A.    I think I do recall that.
24         Q.    And then the Number 3 there,
25   this says "genetics," and it says,

1   "exposure to Depakote and cogentin,
2   cigarettes and ETOH."  ETOH means alcohol,
3   correct?
4           A.   Yes.
5           Q.   If you turn to the second
6   page, and under Identified Risks -- let me
7   note that this is dated -- strike all of
8   this.
9                The first page was dated in
10  April of 1999.  The second page is also in
11  April of 1999.  And under Identified Risks
12  do you see it says "smokes cigarettes."
13  And it says "use of alcohol in early
14  pregnancy"?
15          A.   Yes.
16          Q.   And we don't have to go
17  through the rest.  But you can see that
18  there are references to alcohol?
19          A.   Yes.
20          Q.   And you didn't make any
21  reference to that in your report, correct?
22          A.   No.
23          Q.   Were you aware of that before
24  just now?
25          A.   It was mentioned to me in some

1   discussions with counsel, so I -- if I --
2   I did not see it -- or did not recall it
3   in the documents, from the documents I
4   reviewed.
5         Q.    Did you consider putting it in
6   your report?
7         A.    No.
8         Q.    And Danial does certainly have
9   cognitive delay, correct?
10        A.    Correct.
11        Q.    What can smoking do to a
12  fetus, a mother smoking?
13        A.    Again, a complicated question,
14  but primarily causes small size.
15        Q.    I also didn't see any notation
16  in your report of a possible history of
17  birth defects in Ms. Burnett's family.
18  Did I miss that?
19        A.    I did not mention that.
20        Q.    Were you aware of that?
21        A.    Again, I've heard reference to
22  it.
23        Q.    That would be -- let me ask
24  the question two ways.  In your clinical
25  practice that would certainly be relevant?

1    A.    Yes.

2    Q.    In this job you don't consider it important?

4    A.    In this particular -- in the question I was being asked it had less relevance, specifically because there was no mention of spina bifida being associated with it, and there were no other birth defects noted in this child.

10    Q.    Let me mark as Exhibit 10 the deposition of Dr. Edwards.

13    (Whereupon, Defendant's Exhibit 10 was marked for identification.)

17    Q.    You reviewed this deposition in preparation for your report, right?

19    A.    Yes.

20    Q.    And if you can turn first to the 23rd page of the document, Page 87 of the deposition.  Are you there, sir?

23    A.    Yes.

24    Q.    So Dr. Edwards is testifying at Page 87, Lines 1 through 10.  I'm just

1   going to read it.  "She had some other
2   risk factors in her family, some other --
3   per my records I think I read some of the
4   other family members had neural tube and
5   some other type defects throughout the
6   family.  So, I mean, the precise cause of
7   that baby's problem -- and just a sad
8   thing."  Did I read that correctly?
9           A.    Yes.
10          Q.    And if you could turn over to
11  Page 149 of the deposition.  It's the 38th
12  page of the document.
13          A.    Yes.
14          Q.    And Page 149, Lines 9 through
15  11.  Strike that.  Lines 9 through 12.
16  "You've mentioned and your notes reflect
17  that Ms. Burnett had a family history that
18  included some potential birth defects in
19  other children?"  Answer: "That's what she
20  reported to me, yes."
21          Did I read that correctly?
22          A.    Yes.
23          Q.    You didn't make mention of any
24  of that in your report, did you?
25          A.    No.  I didn't see it

1  substantiated elsewhere.

2

3              (Whereupon, Defendant's
4              Exhibit 11 was marked for
5              identification.)

6

7      Q.   I'm marking as Exhibit 11 a
8  medical record from May 12, 1999.  Says
9  Irina McCall.  That was Ms. Burnett's name
10 at the time, as I understand it.  And it's
11 a note from Dr. Edwards.  That was the
12 deposition we were just reading, correct,
13 Dr. Robin?
14     A.   Can you say it again, I'm
15 sorry?
16     Q.   Sure.  It's the note from Dr.
17 Edwards, who's the person's deposition we
18 were just reading.
19     A.   Yes.
20     Q.   And, I don't know, maybe about
21 nine or ten lines down it says, "in
22 discussion with her there has been
23 multiple problems with birth throughout
24 her family.  Almost all of her family has
25 had babies die at birth of different

1  problems." Did I read that correctly?
2      A.   Yes.
3      Q.   Okay. Some babies with spina
4  bifida die at or near birth?
5      A.   Yes. Yes.
6      Q.   So this is not inconsistent
7  with there being neural tube defects in
8  the family, is it?
9      MS. WILLIAMSON: Objection,
10 form.
11     A.   Yes, you are correct. It's
12 not inconsistent.
13     Q.   And Dr. Edwards is who's
14 actually treated Ms. Burnett, correct?
15 You have not treated Ms. Burnett?
16     A.   Correct.
17     Q.   And Dr. Edwards testified that
18 he remembered neural tube defects --
19     MS. WILLIAMSON: Object to the
20 form. It mischaracterizes his testimony.
21     A.   Correct.
22     Q.   You didn't put any of that in
23 your report?
24     A.   Correct.
25     Q.   A family history of that kind

1  of birth defect would be important in both
2  clinical and this practice, wouldn't you
3  think?
4      A.   If it was substantiated.  I
5  didn't think it was substantiated.  The
6  way -- the way it's alluded to here just
7  made it seem like, to use a legal term,
8  hearsay.  It wasn't substantiated in other
9  reports, and there was no mention of it in
10 other reports.
11     Q.   Did you make any effort
12 whatsoever to investigate further?
13     A.   I'm not sure how I would.
14     Q.   Did you ask Ms. Burnett for
15 more information about what she apparently
16 told Dr. Edwards?
17     A.   No.
18     Q.   Discussing in section four of
19 your report -- and, again, I'm not going
20 to go into a lot of details right now.
21 But it's the medical history of Danial
22 Burnett.  That, again, was based on a
23 record review, correct?
24     A.   Correct.
25     Q.   And, again, it's not intended

Nathaniel H. Robin, M.D.

1   effect from valproic acid.
2        Q.   Could there also be a primary
3   effect from the alcohol use?
4             MS. WILLIAMSON:  Objection,
5   foundation that she actually used alcohol.
6        A.   So if she used alcohol,
7   alcohol -- prenatally, alcohol could
8   contribute to cognitive defects.  Like I
9   said, I didn't see further substantiation
10  of that.
11       Q.   I mean, we can -- let's go
12  back to that record, then because there
13  were two or three other listings on there.
14       A.   I mean, I'm willing to agree
15  with you -- if you're saying that the
16  record in front of me says that, I agree
17  with you the record in front of me says
18  that.  I'm just saying that I didn't see
19  other reports mentioning that as a
20  significant contributor.
21       Q.   Okay.  Did you see reports in
22  her record attributing Danial's cognitive
23  delays to anything other than spina
24  bifida?
25       A.   Not that I recall.

1   information that you've agreed would be
2   relevant to your evaluation in answering
3   that question --
4          A.    Correct.
5          Q.    -- than you do in the legal
6   context, in this context?
7          A.    I apologize.  Correct.
8          Q.    If you could pull out your
9   report.  You don't have to.  If you need
10  to look at it, you can.  Let's put it that
11  way.
12               Page 13 of your report, which
13  is Exhibit 5, there's a section that's
14  listed as your opinions.  Is this sort of
15  the core things that you concluded?
16         A.    Yes.
17         Q.    And Paragraph 2 says, "there's
18  no known history of genetic related birth
19  defects in the family history of the
20  biological mother or father," correct?
21         A.    Correct.
22         Q.    Would you say that that is
23  consistent with the testimony of Dr.
24  Edwards and the exhibit from -- Exhibit 11
25  that we looked at earlier?

1    A.    No.  He said something -- he
2    says there is a history of early death and
3    other things.
4    Q.    So that would be inconsistent
5    with what you put in your report?
6    A.    That would be inconsistent
7    with what I put in the report.
8    Q.    And then the second sentence
9    of that Opinion Number 2 says,
10   "furthermore, there are no findings in
11   Danial to suggest an underlying genetic
12   syndrome is the cause of his NTDs and
13   major congential malformations."
14          You did not perform a
15   dysmorphologic physical exam of Danial to
16   confirm that, correct?
17   A.    Correct.
18   Q.    You relied on a few minutes of
19   the video and the records?
20   A.    Correct.
21   Q.    Last week or a couple of weeks
22   ago in the Erpelding deposition you
23   testified that a physical examination has
24   become less and less important as genetic
25   testing has gotten better and better.

Nathaniel H. Robin, M.D.

```
 1                C E R T I F I C A T E
 2
 3
 4   STATE OF ALABAMA
 5   MADISON COUNTY
 6
 7              I hereby certify that the
 8   above and foregoing deposition was taken
 9   down by me in stenotypy, and the questions
10   and answers thereto were reduced to
11   typewriting under my supervision, and that
12   the foregoing represents a true and
13   correct transcript of the deposition given
14   by said witness upon said hearing.
15              I further certify that I am
16   neither of counsel nor of kin to the
17   parties to the action, nor am I in anywise
18   interested in the result of said cause.
19
20
21
22
23         Heather Spier
24         COMMISSIONER-NOTARY PUBLIC
25         ACCR LICENSE NO. 403, Exp. 9/30/2018
```